STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JOHN MARVIN WILLIAMS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted February 22, 1989—Decided April 21, 1989.

Before Judges MICHELS, MUIR, JR., and KEEFE.

*Alfred A. Slocum,* Public Defender, attorney for appellant (*Perry Feinberg,* Designated Counsel, of counsel and on the letter brief).

*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney for respondent (*Robert G. Brehme,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Tried to a jury, defendant John Marvin Williams was convicted of armed robbery, a crime of the first degree, in violation of *N.J.S.A.* 2C:15-1. Following a hearing, the trial court determined that defendant had committed the robbery while in possession of a firearm within the meaning of the Graves Act, *N.J.S.A.* 2C:43-6c and d, and committed defendant to the custody of the Commissioner of the Department of Corrections for

15 years with a five-year period of parole ineligibility. In addition, the trial court assessed a penalty of $100 payable to the Violent Crimes Compensation Board. Defendant appeals.

Defendant seeks a reversal of his conviction and a remand for a new trial or, alternatively, a vacation of the sentence and a remand for resentencing on the following grounds set forth in his letter brief:

    I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT REFUSED TO REQUIRE THE PUBLIC DEFENDER TO DEFEND WILLIAMS.

    II. THE LOWER COURT ERRED IN PERMITTING THE JURY TO CONTINUE DELIBERATION AFTER BEING NOTIFIED OF A DEADLOCK.

    III. THE TRIAL COURT'S DECISION TO IMPOSE THE PENALTIES OF THE GRAVES ACT WAS IN ERROR.

    IV. THE SENTENCING COURT ILLEGALLY SENTENCED WILLIAMS BY FAILING TO FOLLOW PROPER STATUTORY SENTENCING GUIDELINES.

We have carefully considered the contentions challenging defendant's conviction set forth in *Points* I and II, *supra,* and all the arguments advanced by him in support of them and find that they are clearly without merit. *R.* 2:11–3(e)(2). Further comment, however, is appropriate with respect to some of those contentions before turning to defendant's challenge to the sentence.

## I.

Defendant contends in *Point* I, *supra,* that the trial court erred in failing to order that the Assistant Public Defender assigned to represent him actively participate in the trial, after defendant informed the trial court that he was not satisfied with his representation and did not wish to represent himself. That error, according to defendant, denied him his constitutional right to the effective assistance of counsel. We disagree.

Defendant was represented by competent counsel at every critical step in the proceeding. After defendant informed the trial court prior to the commencement of the trial that he was not satisfied with his counsel's representation, that he was not

prepared to go to trial and that he wanted a new pool attorney assigned to represent him, the trial court ordered defense counsel to continue to represent defendant. Defendant was fully and actively represented by counsel during a *Rule* 8 hearing, after which the trial court determined that a statement given to the police by defendant had been made voluntarily.

When the trial resumed the following day, defendant informed the trial court that his mother was attempting to retain private counsel and requested a postponement. Defendant also told the trial court that he would not proceed with his present counsel. The trial court informed defendant that he could proceed *pro se* and that defense counsel would sit with him to lend assistance. Defendant refused to proceed *pro se* and demanded that defense counsel not participate in the jury selection or in the trial. The trial court thereupon ordered defense counsel to represent defendant.

The trial court impaneled the jury and defense counsel participated in the selection of the jury. Defendant thereupon became disruptive and the jury panel was cleared from the courtroom. The trial court admonished defendant that it would not tolerate any further disruptions and denied defendant's renewed request for the assignment of another pool attorney. The trial court, however, adjourned the case until the afternoon. That afternoon, defense counsel informed the trial court that he had spoken to defendant's girlfriend and was advised that defendant's family was attempting to retain private counsel. The trial court thereupon recessed the trial until the next day.

The following morning, defendant failed to have his mother or any other member of his family in court to explain what efforts were being made to retain private counsel. As a result, the trial court ordered the trial to proceed. Defendant again became disruptive after the jury was sworn, and the trial court ordered him removed from the courtroom. Defense counsel, who was permitted to leave the courtroom to consult with defendant, advised the trial court that defendant did not want

him to do anything during the trial and that he would follow defendant's direction. While still in the holding cell, defendant further disturbed the proceedings, requiring the trial court to return defendant to jail.

Defense counsel, pursuant to defendant's demand, did not open to the jury and did not cross-examine the State's witnesses. At the conclusion of the State's evidence, however, defendant reconsidered his position and permitted defense counsel to actively participate in the remainder of the trial. Defense counsel previously had subpoenaed the State's principal witnesses, the victim and the detective who took defendant's statement. Defense counsel thereupon called the victim, who testified that although he was unable to identify defendant as the perpetrator, defendant's height was approximately that of the person who committed the robbery. In addition, defense counsel called defendant's girlfriend and, finally, defendant. At the conclusion of the proofs, defense counsel delivered a closing argument to the jury and was present during the trial court's final instructions to the jury. In addition, defense counsel was present when the jury returned with a question during deliberations and when the verdict was returned by the jury.

Although defense counsel did not make an opening statement to the jury in compliance with defendant's demand, *R.* 1:7–1(a) expressly makes opening statements on behalf of criminal defendants a matter of choice. Therefore, defendant cannot claim that his counsel's decision to refrain from making an opening statement to the jury was a *per se* deprivation of his right to counsel. Additionally, defendant was not deprived of his right to counsel by defense counsel's decision not to cross-examine the State's witnesses in compliance with defendant's instructions. Defense counsel remained in the courtroom during the State's case-in-chief and had the opportunity to hear and evaluate the witnesses' testimony. Moreover, defense counsel had previously subpoenaed two of the three witnesses who testified for the State. Thus, when defendant changed his

tactics and permitted defense counsel to present a defense, defense counsel was able to recall the principal witness—the victim. Defense counsel, as pointed out above, also called defendant's girlfriend and defendant. Additionally, it is important to understand that after the State rested its case on Thursday, defense counsel requested and was granted an adjournment until the following Monday. This allowed defense counsel additional time to evaluate the State's case and to prepare defendant's case.

Moreover, *State v. McCombs*, 171 *N.J.Super.* 161 (App.Div. 1978), aff'd o.b., 81 *N.J.* 373 (1979), and *State v. Wiggins*, 158 *N.J.Super.* 27 (App.Div.1978), relied upon by defendant, are clearly distinguishable and do not require a reversal of defendant's conviction. Here, unlike in *State v. McCombs, supra*, 81 *N.J.* at 374, defendant was not "left adrift during so crucial a phase of the trial as the jury selection process." Additionally, we are not dealing with "an *ex-parte*, nonadversarial, *in absentia* proceeding, not unlike a grand jury presentation," in which defense counsel remains in the courtroom but does not participate in any way in the trial. *See State v. Wiggins, supra*, 158 *N.J.Super.* at 31.

In sum, we are satisfied that the integrity of the trial process was preserved, see *Mayberry v. Pennsylvania*, 400 *U.S.* 455, 468, 91 *S.Ct.* 499, 506, 27 *L.Ed.*2d 532, 541–542 (1971) (Burger, C.J., concurring), and that defendant was not deprived of the reasonably effective assistance of counsel guaranteed to him under the United States and New Jersey Constitutions. *See Strickland v. Washington*, 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), reh. den., 467 *U.S.* 1267, 104 *S.Ct.* 3562, 82 *L.Ed.*2d 864 (1984); *United States v. Cronic*, 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657 (1984). *See also State v. Fritz*, 105 *N.J.* 42 (1987).

## II.

We turn to defendant's challenge to the legality of the sentence. Defendant contends that the trial court erred in

sentencing him under the Graves Act, *N.J.S.A.* 2C:43–6c and d, because the starter pistol used in the robbery does not fall within the statutory definition of a firearm. We agree.

The Graves Act provides generally that one who uses or possesses a firearm while committing, attempting to commit or fleeing after committing certain enumerated serious offenses must be sentenced to imprisonment for a term that includes at least three years of parole ineligibility. *State v. Gantt,* 101 *N.J.* 573, 579 (1986). The obvious intent of our Legislature in enacting the Graves Act was to deter the use and possession of firearms by criminals in order to reduce the number of persons killed or injured by such weapons. *State v. Des Marets,* 92 *N.J.* 62, 72 (1983); *State v. Bill,* 194 *N.J.Super.* 192, 196 (App.Div. 1984). The Graves Act is directed at real guns that pose actual physical danger to the potential victims of crime. *State v. Gantt, supra,* 101 *N.J.* at 582. The actual danger with which the Graves Act is concerned is not present when the defendant uses a toy or fake gun. *See State v. Gantt, supra,* 101 *N.J.* at 584–585. Thus, in *State v. Ortiz,* 187 *N.J.Super.* 44, 49–50 (App.Div.1982), we held that a crime committed while armed with a fake gun or a toy gun did not fall within the purview of the Graves Act.

The Graves Act incorporates the definition of "firearm" contained in *N.J.S.A.* 2C:39–1f, which provides:

"Firearm" means any handgun, rifle, shotgun, machine gun, automatic or semi-automatic rifle, or any gun, device or instrument in the nature of a weapon from which may be fired or ejected any solid projectable ball, slug, pellet, missile or bullet, or any gas, vapor or other noxious thing, by means of a cartridge or shell or by the action of an explosive or the igniting of flammable or explosive substances. It shall also include, without limitation, any firearm which is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or missile smaller than three-eighths of an inch in diameter, with sufficient force to injure a person.

Here, the record is barren of any evidence that the starter pistol used in the robbery was capable of firing or ejecting a

projectile of any kind, or any other noxious thing. Starter pistols generally are used to signal the start of races and in connection with other sporting events, as well as to train animals. They are not designed to, nor do they, fire or eject a deadly missile, tear gas or any other object, vapor or noxious thing. They simply give off a noise.

The State's expert witness was of the opinion that a starter pistol, "generally speaking," is capable of chambering a tear gas round or cartridge. He further expressed the opinion that if one loads a tear gas cartridge into a starter pistol and fires it, the tear gas "disperses in a very small area" and "comes out of the barrel if the barrel is not completely obstructed [,or] comes out of the cylinder, which is before it enters the barrel." The expert witness, however, never examined the starter pistol used in the robbery and, consequently, he did not know whether the gun was capable of chambering a tear gas cartridge or the barrel was obstructed. Moreover, the starter pistol was not produced at trial and, therefore, there was no proof whatsoever as to whether the barrel was obstructed in any way. If the barrel of the starter pistol was obstructed, it is perfectly obvious that neither a missile nor other noxious thing, including tear gas, could be fired or ejected from or through the barrel.

Based upon these proofs, we disagree with the trial court's finding that the dispersion of the tear gas in and around the cylinder was the equivalent of the gas being "fired or ejected" for the purpose of *N.J.S.A.* 2C:39–1f. A starter pistol that is neither designed to fire or eject nor capable of firing or ejecting a missile or other noxious thing, including tear gas, is not a firearm within the meaning or intent of *N.J.S.A.* 2C:39–1f. The mere fact that a tear gas cartridge or shell may be placed in the cylinder of a starter pistol and that, when the pistol is fired, gas subsequently escapes in or around the cylinder or through a partially obstructed barrel, is insufficient to qualify a starter pistol as a firearm for the purpose of enhancing punishment under the Graves Act. The danger in using real guns to

commit crime that is emphasized by the legislative history of the Graves Act and by our courts in *State v. Gantt, supra,* and *State v. Ortiz, supra,* does not exist when a starter pistol, a toy gun or a fake gun is involved in a crime.

Our conclusion that a starter pistol is not a "firearm" for Graves Act purposes finds support in the courts of several states, which generally treat starter pistols as equivalent to imitation guns that are not firearms. *See State v. Lawr,* 263 *N.W.*2d 747, 750 (Iowa 1978) (in which the court held that a starter pistol that was unable to fire a projectile was not a firearm under the definition that a firearm "must be able to propel a projectile and ... must do so by explosive force"); *State v. Davis,* 227 *Kan.* 174, 177, 605 *P.*2d 572, 575 (1980) (in which the court held that a starter pistol that was incapable of propelling a projectile was not a firearm under the definition that a firearm is designed "to propel a projectile by force of an explosion, gas, or other combustion"); *Wright v. State,* 70 *Md.App.* 616, 620, 522 *A.*2d 401, 402–403 (1987) (in which the court stated that the definition that a firearm "must propel a missile by gunpowder or some such similar explosive" or "be readily or easily converted into" a device capable of so propelling a missile, "serves to exclude entirely such weapons as starter pistols ..., which are simply not designed or constructed to fire missiles by gaseous explosion and, because of their design and construction, are not capable of doing so"); *LaMere v. State,* 278 *N.W.*2d 552, 556–557 (Minn.1979) (in which the court determined that an inoperable firearm was still a "firearm," despite its inoperability, and stated that, "[i]n saying this, we wish to make it clear that this decision does not include toy guns, simulated guns, or blank starter pistols"); *State v. Franklin,* 41 *Wash.App.* 409, 416, 704 *P.*2d 666, 671 n. 3 (1985) (in which the court stated that "[s]ince a 'firearm' is defined as a weapon capable of emitting a projectile, and since a starter pistol normally cannot emit a projectile, the officer did not have probable cause to arrest [defendant] for a weapons offense.") *See also People v. Ray,* 119 *Mich.App.* 724, 727–29, 326 *N.W.*2d 622,

624 (1982); *Coleman v. State*, 506 *P*.2d 558, 560–561 (Okla. Crim.App.1972).

Those jurisdictions that have held starter pistols to be firearms have done so under statutes that specifically define starter pistols as firearms if they are designed to or may readily be converted to expel a projectile by the action of an explosive. *See United States v. 16,179 Molso Italian .22 Caliber Winlee Derringer Convertible Starter Guns*, 443 *F*.2d 463, 465 (2d Cir.1971), *cert.* den., 404 *U.S.* 983, 92 *S.Ct.* 447, 30 *L.Ed.*2d 367 (1971); *Ridley v. State*, 441 *So.*2d 188, 189 (Fla.App.1983); *Commonwealth v. Melvin*, 378 *Pa.Super.* 59, 70–71, 548 *A.*2d 275, 280 (1988).

Consequently, since the State failed to prove that the starter pistol used by defendant in the commission of the armed robbery was a "firearm" within the meaning of the Graves Act, the Graves Act was improperly applied in sentencing defendant. Therefore, the five-year term of parole ineligibility imposed on defendant is vacated and the matter is remanded to the trial court for resentencing.

Accordingly, except to vacate the five-year period of parole ineligibility and remand the matter for resentencing, the judgment of conviction under review is affirmed.